**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Michelle Perfanov<br>Plaintiff,<br>v.<br>Commonwealth of Pennsylvania,<br>Pennsylvania State Police,<br>PSP Trooper Ronald Keith Davis, individually and in his capacity as a PSP Trooper,<br>County of Dauphin,<br>Lehigh Valley Health Network, Inc.,<br>Lehigh Valley Hospital – Schuylkill, Alex Mercado, M.D., in his capacity as an Attending Emergency Room Doctor at Lehigh Valley Hospital – Schuylkill, and<br>John Does 1-15, in their official capacity as Pennsylvania State Police Troopers<br>Defendants. | : | No.: 5:25-cv-04772-CH<br><br>JURY TRIAL DEMANDED |

**<u>FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS</u>**

Plaintiff Michelle Perfanov, by and through her undersigned counsel, files this First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a) and this Court's Memorandum Opinion and Order of September 22, 2026 (ECF Nos. 57–58), and in support thereof avers as follows:

## INTRODUCTION

1. In approximately June 2023, Defendant Ronald Keith Davis, a Pennsylvania State Police trooper, told Plaintiff that if she ever left their romantic relationship, he would "paint [her] as crazy."

2. Plaintiff ended their romantic relationship on August 20, 2023.

3. The next day, Davis reported to state police and County crisis staff that she had threatened suicide.

4. Davis provided the Dauphin County Crisis Intervention Program out-of-context fragments of Plaintiff's text messages and false statements about her.

5. Without verifying that information or reviewing the full text conversations, a County caseworker completed a Section 302 application on Davis's behalf, and a County mental health delegate issued a warrant on it.

6. Davis then sought out and found Plaintiff at a picnic table in Weiser State Forest.

7. He seized her by force, restricted her breathing by compressing her torso, and slammed her head-first into the ground, injuring her.

8. Other troopers took custody of Plaintiff and transported her to a hospital in another county.

9. When Plaintiff arrived at LVHS, the Section 302 packet available to hospital and crisis staff was incomplete.

10. LVHS initially reported a Box B petition to Schuylkill County Crisis.

11. The underlying application and warrant used the Box A warrant procedure.

12. Hospital staff continued the Section 302 process while crisis staff sought the missing material.

13. An LVHS physician certified continued involuntary treatment on August 21.

14. The original County paperwork remained at Dauphin County Crisis until August 22, when it was sent by overnight delivery.

15. Plaintiff consistently denied suicidal ideation.

16. On August 24, 2023, Plaintiff signed a voluntary-treatment consent.

17. Her treating physician had indicated an intent to change her status, and Plaintiff recalls a physician or resident telling her that she should not be there and that Davis's complaints were trivial.

18. She was discharged from Lehigh Valley Hospital - Schuylkill on August 25, 2023.

## PARTIES

19. Plaintiff Michelle Perfanov is an adult individual and United States citizen with a mailing address of P.O. Box 114, Mount Joy, PA 17552.

20. Defendant Ronald Keith Davis ("Davis") is an adult individual with a personal address of 432 West Market Street, Williamstown, PA 17098. At all relevant times he was employed as a trooper with the Pennsylvania State Police ("PSP"). Davis remains employed by PSP. Davis is sued in his individual capacity on Counts I–IV, VII, and XII, and in his official capacity solely for the prospective declaratory and injunctive relief requested in Count VI. No monetary damages are sought against him in his official capacity.

21. Defendants John Doe PSP Troopers 1–15 ("Doe Troopers") are the PSP troopers who arrived at Weiser State Forest, took custody of Plaintiff, transported her to Lehigh Valley Hospital – Schuylkill, and remained with her there. They are sued in their official capacities. Plaintiff will substitute their true names when that information becomes available, subject to the Court's amendment restrictions.

22. Defendant Commonwealth of Pennsylvania, Pennsylvania State Police ("PSP") is an agency of the Commonwealth of Pennsylvania. Plaintiff seeks only prospective relief against PSP as described below, pursuant to the leave described at pages 9–10 of the September 22, 2026 Opinion.

23. Defendant County of Dauphin (“the County”) is a third-class county of the Commonwealth of Pennsylvania. The Dauphin County Department of Mental Health, Autism, and Developmental Programs (“DCMH”) administers the Dauphin County Crisis Intervention Program (“DCCI”). The Department and Program are parts of the County and operate from 100 Chestnut Street, Harrisburg, PA 17101.

24. Defendant Lehigh Valley Health Network, Inc. ("LVHN") is a Pennsylvania non-profit corporation with a registered office at Cedar Crest and I-78, Allentown, PA 18105.

25. Defendant Lehigh Valley Hospital – Schuylkill ("LVHS") is a Pennsylvania non-profit business, fully owned and operated by LVHN, with places of business at 420 South Jackson Street and 700 E. Norwegian Street, Pottsville, PA 17901. LVHN and LVHS are together the "Hospital Defendants."

26. Defendant Alex J. O. Mercado, D.O., incorrectly previously named Alex Mercado, M.D. in the original Complaint, ("Mercado") is an adult individual who, at all relevant times, was employed by LVHN as an attending emergency room physician at LVHS. The assessment, certification, and continuation-of-detention decisions attributed to Mercado in this pleading were undertaken within the scope of that employment or other agency.

**JURISDICTION AND VENUE**

27. This action arises under 42 U.S.C. § 1983 for violation of rights under the Fourth and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3), and supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367. Declaratory relief is authorized by 28 U.S.C. §§ 2201–2202.

28. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1), because all Defendants reside in Pennsylvania and Defendant LVHN resides in this District.

## FACTUAL ALLEGATIONS

### A. The relationship and Davis's threat

29. In early 2023, Plaintiff, an experienced marketing, communications, and real estate professional, and Davis began a professional relationship and casual friendship.

30. By the spring of 2023, the relationship between them had become romantic.

31. In approximately June of 2023, Davis warned Plaintiff: "if you ever leave me, I will paint you as crazy. I know you are not crazy, but I will do it anyway. I can be a great actor. I know the law. You do not know the law."

32. Davis also boasted that troopers can "flash a badge" without question.

33. Davis told Plaintiff that an earlier issue involving a former girlfriend had caused trouble for him at the Lykens barracks, that he had transferred afterward, and that he regarded Internal Affairs as "a joke."

34. He also told Plaintiff that troopers are "trained to manipulate the truth."

35. Davis pressed for access to Plaintiff's phone, asked to track her by GPS, and insisted that, if she dated a trooper, she had to "protect" them and "not start trouble."

36. Plaintiff became increasingly fearful as Davis's statements and conduct reflected manipulation, surveillance demands, and expectations of silence and compliance.

37. Plaintiff subsequently learned that Davis remained legally married on or about August 20, 2023.

38. On that same day, August 20, 2023, she told Davis she was ending the romantic relationship.

39. Davis responded with an angry, aggressive outburst, declaring he was "in cop mode now" and could not turn it off.

40. He then called his former PSP barracks at Lykens.

41. Plaintiff gathered some personal belongings and left the residence she had been sharing with Davis.

42. Plaintiff told Davis they would discuss a civil separation the next day, after he had time to calm down.

**B. August 21, 2023: Davis's false report**

43. On the morning of August 21, 2023, Davis locked Plaintiff out of the previously shared residence and access to her remaining belongings.

44. Davis also disconnected utilities to her mobile office that morning.

45. Plaintiff used the camper as a mobile office and kept work materials there.

46. After Davis disconnected its utilities, Plaintiff left to work outdoors at a picnic table in Weiser State Forest.

47. That same date, he sent belittling texts and emails and threatened retaliation by leveraging his position in law enforcement.

48. Plaintiff responded by addressing Davis's deception, including his marital status, and by criticizing his inability to manage anger and his efforts to isolate her and damage her reputation.

49. At approximately 10:58 a.m. on August 21, 2023, Davis entered PSP Troop H Lykens Station after receiving a text from Plaintiff that he later cited out of context.

50. Because he was a trooper assigned to another barracks, station personnel allowed him into a part of the station ordinarily closed to civilians.

51. Davis sought out the supervisor on duty and falsely claimed that Plaintiff had threatened suicide and was intellectually disabled.

52. He further cast Plaintiff as unstable.

53. The text fragments Davis referenced were stripped of telling context.

54. The fragments came from heated exchanges in which Plaintiff addressed Davis's deception about his marital status, his anger, and his efforts to isolate her and damage her reputation.

55. Plaintiff recalls that many other texts were jokes and sarcastic responses to Davis's conduct, rather than genuine statements of intent.

56. Davis understood the meaning of Plaintiff's replies because he participated in the exchanges and was familiar with their shared context, including the surrounding communications concerning their relationship.

57. When Corporal Brett Ast asked whether Plaintiff had access to weapons, Davis said she did not.

58. Davis asked to accompany the troopers on their welfare checks and told Ast he could get Plaintiff to say that she had sent the texts and needed help.

59. He appeared agitated and angry and changed his story repeatedly to obtain an involuntary commitment of Plaintiff.

60. Ast told Davis not to accompany the troopers on the welfare checks because of Davis's relationship with Plaintiff.

61. Lykens troopers conducted the checks without him.

62. The troopers did not find Plaintiff during the welfare checks.

63. Davis intensified his efforts to have Plaintiff involuntarily committed, including insulting colleagues.

64. At approximately midday, Davis stated there would be "two dead bodies" if Plaintiff was not found and detained.

65. Davis said he did not want to proceed himself because he could be "Blue-Teamed" and "get in trouble," and he overtly sought others to act on his behalf.

**C. DCCI issues a 302 warrant on Davis's report**

66. Ast told Davis that he did not believe PSP had enough information to obtain a Section 302 warrant and suggested that Davis petition on his own.

67. Davis then called DCCI and spoke with Van Sickle.

68. Van Sickle prepared the Section 302 application from Davis's account and selected communications without independently corroborating his account or reviewing the full exchanges.

69. She signed for Davis on the applicant signature line.

70. In Part I of the application, Box A requested issuance of a warrant.

71. Van Sickle recorded that she used Box A because Davis was not acting in his capacity as a police officer.

72. The application referred to attachments for the description of the conduct supporting the request.

73. The attached materials included selected and out-of-context text excerpts attributed to Plaintiff, including "If I'm supposed to die then so be it," "drive off a cliff," and "go out in style."

74. The application selected inability to care for oneself as the basis for finding a clear and present danger to Plaintiff.

75. It did not select the separate suicide or self-mutilation grounds.

76. The account supplied did not establish inability, because of mental illness, to meet Plaintiff's needs for nourishment, personal or medical care, shelter, or self-protection and safety,

with a reasonable probability of death, serious bodily injury, or serious physical debilitation within thirty days without adequate treatment.

77. Plaintiff had made no suicide attempt or plan and presented no clear and present danger under 50 P.S. § 7301(b).

78. Pascoa signed Part III, Box A, granting a warrant authorizing transport to “any local emergency department” and, if required, admission to “any appropriate psychiatric facility.”

79. Van Sickle and Pascoa relied on Davis’s account without independent corroboration.

80. DCCI ordinarily attempted to contact the person identified in a Section 302 application before proceeding with an involuntary examination.

81. Van Sickle did not attempt to contact Plaintiff after Davis told her that Lykens did not want Crisis to speak with Plaintiff and that Plaintiff had refused to speak with Crisis.

82. Davis disclosed to DCCI that he was off duty and Plaintiff’s former romantic partner.

83. Davis also told Van Sickle that he had understood earlier remarks by Plaintiff about self-harm as expressions of frustration and anger.

84. Van Sickle conveyed an overview of Davis’s account to Pascoa.

85. The Warrant was approved despite the known bias of the reporter and the lack of additional information.

86. Pascoa approved the warrant after Van Sickle conveyed Davis’s account.

87. Davis had told Van Sickle that Plaintiff was staying in a camper he owned.

88. At 12:19 p.m. on August 21, 2023, Davis emailed Van Sickle from his PSP account, quoting selected fragments of Plaintiff's text messages and attaching an image file.

89. He also inaccurately described Plaintiff as depressed, unemployed, homeless, and in debt.

90. Pascoa reviewed the initial application and selected text messages.

91. The account supplied no specific conduct showing that Plaintiff could not obtain nourishment, care, or shelter, or that the reported circumstances made death, serious bodily injury, or serious physical debilitation reasonably probable within thirty days.

92. Davis did not provide the full conversations.

93. Davis sent additional material from his PSP email account at approximately 6:29 p.m.

94. The later materials were not before Pascoa when she approved the Warrant.

95. Van Sickle presented Davis's initial email as part of the application.

**D. Davis takes the Warrant**

96. DCCI faxed the Application and Warrant to Lykens Station.

97. When the Warrant printed at Lykens, Trooper Osayomwonbor Rachael Algbdedo picked it up to make a copy.

98. Davis took the faxed Warrant from her hands, said he would take care of the matter himself, and left the station at approximately 1:17 p.m.

99. Davis took the faxed Warrant with him and told Kerry Teter that there was a warrant before they went looking for Plaintiff.

100. Trooper Michael Giacobbe had been told that a Section 302 warrant had issued but had not seen it before leaving for the forest.

101. Corporal Jeffrey Goodman understood that the responding troopers went to the scene without a copy.

102. Goodman believed Davis produced a copy from his vehicle when asked and closer to the time of transport.

103. Hospital personnel at LVHS reported missing pages and irregularities in the commitment paperwork available to them.

104. The hospital chart contains a copy of the warrant page bearing an August 21, 2023, 3:06 p.m. PSP Lykens fax header.

105. Before leaving, Davis asked dispatcher Kassandra Kline whether she had begun locating Plaintiff through her phone and whether he could see the location if obtained.

106. Kline told him she was waiting for the warrant and a supervisor's direction.

107. Davis told DCCI he would start looking for Plaintiff himself, despite his off-duty status and personal involvement.

108. The station did not obtain a phone location before Davis reported that he had found her.

**E. The seizure at Weiser State Forest**

109. Davis enlisted his friend Kerry Teter, a civilian, to help locate Plaintiff.

110. They traveled in Teter's vehicle to the Greenland Tract of Weiser State Forest, where Plaintiff had earlier said she would be working outdoors.

111. Plaintiff had been sitting at a picnic table updating her résumé on her laptop.

112. She stood as the vehicle approached. Before Davis seized her, she showed no indication of self-harm or threats to others.

113. As Davis and Teter approached, and before Davis seized her, she made no threatening or aggressive moves.

114. Davis jumped from Teter's moving vehicle and sprinted toward Plaintiff.

115. While Plaintiff told him to stay away, Davis shouted, "You are coming with me."

116. Without explaining why he was seizing her or identifying himself as acting as a trooper, Davis grabbed Plaintiff in a wrestling-style hold, folded her legs toward her torso, and lifted her off the ground against her will, restricting her ability to breathe.

117. He carried her several yards and slammed her against a vehicle.

118. Plaintiff repeatedly told Davis she could not breathe.

119. Davis forced Plaintiff's hands behind her back and pressed his body weight against her rib cage and torso while holding her against the vehicle, preventing her from taking full breaths.

120. Restrained without explanation and unable to breathe, Plaintiff bit Davis once and kicked him in an effort to free herself from his hold.

121. Plaintiff asked Davis to explain why she was being seized.

122. Instead of answering, he escalated the force, slamming her head-first into the ground and landing on top of her body.

123. The initial grab occurred before Teter began recording.

124. Teter lost sight of Davis and Plaintiff near the tree line and saw Davis carrying Plaintiff toward the vehicle when he regained sight of them.

125. Plaintiff suffered injuries to her head, ribs, elbow, and knee, and multiple abrasions and contusions to her head and body.

126. LVHS records include injury photographs and wound entries involving her scalp, forearm, back, buttock, and both lower extremities.

127. Davis directed Teter to begin recording as Davis and Plaintiff reached her vehicle and Davis was speaking with PSP by telephone.

128. The initial restraint was outside the recorded portion.

129. On the video, Davis asked, "Are you getting this?" as Plaintiff struggled to breathe.

130. When Plaintiff asked Teter what was happening, Teter said they were "there to get [her] help."

131. Davis continued to restrain Plaintiff without explanation.

132. He then pulled out his phone and stated, "Hurry, she's resisting arrest."

133. That was the first time he referenced any purported basis for the seizure.

**F. The Doe Troopers take custody**

134. Troopers Michael Giacobbe, Donald Davis, and Alexander Azambuja were en route to the Greenland Tract when dispatch relayed that Davis had found Plaintiff.

135. Davis had reported finding her at approximately 1:33 p.m.

136. The responding troopers continued to the location dispatch relayed.

137. Upon arrival, Trooper Donald Davis ran at Plaintiff and forcefully took custody by slamming her head against the patrol car twice while handcuffing and searching her.

138. Responding Doe Troopers were present when Trooper Donald Davis took custody of Plaintiff and slammed her head against the patrol car twice while handcuffing and searching her.

139. These head impacts constituted excessive force under the circumstances described above.

140. The Doe Troopers who observed Donald Davis's force and had a realistic and reasonable opportunity to prevent further force failed to intervene, causing injury, pain, and emotional distress that timely intervention would have prevented.

141. At no time did Plaintiff exhibit suicidal ideation or pose a danger to herself or others.

142. Plaintiff repeatedly asked why she was being detained and demanded to see the Warrant.

143. The responding troopers did not show Plaintiff the Warrant when she asked to see it.

144. The troopers spread out, searched the area, and at points joked among themselves and smoked while Plaintiff remained restrained.

145. When Plaintiff pressed Trooper Giacobbe for an explanation, he said that he was not quite sure — maybe suicide, and that if there was a warrant, they have to take her in.

146. Plaintiff protested that this was a "domestic dispute" turned frame-up by her ex-boyfriend, a trooper, and asked the troopers to review Teter's video showing part of the encounter.

147. Giacobbe called Goodman to report that Plaintiff had visible injuries and that the encounter had become physical.

148. Goodman directed the troopers to delay transport until he arrived and assessed the situation.

149. Goodman arrived at approximately 2:00 p.m., took photographs of Plaintiff's visible injuries, and reviewed Teter's video.

150. Troopers found no weapon on Plaintiff or during the searches reported to Goodman.

151. The restraint techniques used by Davis on the video were not techniques taught in PSP training.

152. Goodman determined that uniformed, on-duty troopers unconnected to Plaintiff should have made contact and attempted to take her into custody with as little force as necessary.

153. Plaintiff saw Davis sifting through her belongings at the picnic table and laughing with Teter.

154. Davis tried to search her vehicle "for keys."

155. Plaintiff expressly refused consent, and Giacobbe told Davis he did not have consent.

156. The troopers searched Plaintiff.

157. At Plaintiff's request, Giacobbe took her phone and laptop for transport.

158. He placed other items in her vehicle.

159. Records reflect that Davis reported himself on desk or back duty from 1:30 p.m. to 6:30 p.m. that day, despite his personal involvement in the seizure.

160. At about 2:06–2:08 p.m., he texted Plaintiff's friend Carrie Hoy, "I got her, she's safe."

161. At the scene, Goodman explained that if Davis claimed to have activated himself while off duty, Davis would need to submit written correspondence to his station commander.

162. Davis initially told Sergeant Matthew Klein that he had acted as Plaintiff's boyfriend and had not activated himself as a trooper.

163. Davis later submitted an SP3-201 letter claiming self-activation.

164. Klein had the letter by August 22 and directed that an injury packet be prepared based on the letter and the marks Davis showed him.

165. In a separate message to Trooper Jordan Garrett, Davis described his conduct as that of someone who cared about Plaintiff and said he had acted "not as a cop."

166. The responding troopers were aware that Davis was off duty and personally involved.

167. After arriving, they took custody of Plaintiff and continued her detention and transport despite the circumstances described above.

168. Giacobbe and Donald Davis transported Plaintiff by a back-road route through Tower City to LVHS in Pottsville, Pennsylvania.

169. They told her they were taking her to a different county "for [her] protection" because Davis knew too many people in Dauphin County.

170. The Warrant directed transport to "any local" emergency department.

171. Dispatch advised Giacobbe that Pottsville was accepting Section 302 patients.

172. Giacobbe estimated that the trip took approximately 35 minutes and that the winding dirt road increased the travel time.

173. Plaintiff did not reach triage until about 3:32 p.m.

**G. Plaintiff's detention at LVHS**

174. At intake, the troopers presented Plaintiff as a "302."

175. Plaintiff denied suicidal ideation and stated that she had been assaulted and framed by Davis in retaliation for ending the relationship.

176. Nursing documentation at approximately 3:47 p.m. records her denial of suicidal and homicidal thoughts.

177. Mercado's emergency department note records both Plaintiff's denial of current or past suicidal ideation and the clinician's finding of suicidal thought content.

178. The history attributes reported plans involving a vehicle and the woods to the text messages and records that Plaintiff described a single spoken statement during the argument.

179. Plaintiff disputes that she confirmed suicidal ideation and denies that she had suicidal intent or a plan.

180. At approximately 4:11 p.m., Schuylkill County Crisis recorded that an LVHS emergency department clinician described Plaintiff as having been brought in by police on a "box b petition."

181. That description differed from the Box A application and warrant signed in Dauphin County.

182. Hospital staff told Plaintiff there was an issue with the Warrant, asked her to wait, and continued holding her while attempting to resolve the missing paperwork.

183. Plaintiff was told that she might not have to stay after staff resolved the paperwork concerns.

184. Plaintiff recalls hospital personnel telling her that similar incidents involving purportedly invalid Section 302 commitments had happened before. DCCI separately recorded that Melissa Powlick of Schuylkill County Crisis reported that PSP Lykens had previously brought a person into Schuylkill County under another county's Section 302 authorization.

185. At approximately 5:10 p.m., psychiatric emergency services clinician Lidia H. German reviewed the copy and recorded that the petitioning statement attributed to a police officer had been completed incorrectly.

186. She questioned the petition's validity and notified crisis staff.

187. Schuylkill crisis worker Tayler Miller recorded that pages were missing and that the available paperwork was a copy.

188. Schuylkill crisis worker Melissa Powlick contacted DCCI and reported that she could not read a page containing a text message.

189. DCCI told Powlick that it had not been advised that Plaintiff had been found or taken to another county. DCCI also reported that it had yet to receive an additional text message Davis had agreed to send.

190. DCCI contacted Davis for the additional text.

191. Van Sickle emailed Powlick materials that evening. Miller recorded that Powlick left the decision whether Plaintiff would stay with the LVHS emergency department.

192. Hospital records reflect that between approximately 5:30 and 6:02 p.m., Van Sickle told hospital staff that the Warrant was valid because Davis was off duty and the County had granted it.

193. At approximately 6:04 p.m., German forwarded to Mercado the additional reports of suicidal ideation with multiple plans and other case updates.

194. German separately updated the nurse identified as "Jojo."

195. German's note states that the original packet was still needed in the emergency department for placement or transfer.

196. During this period, DCCI spoke with Davis.

197. Davis told DCCI that Plaintiff had attacked him and that he had been on duty.

198. Davis omitted that he had assaulted Plaintiff during the restraint before she bit and kicked him.

199. Following those communications, crisis staff indicated that a 302 would proceed.

200. The emergency department initially had an incomplete copy of the single Section 302 packet.

201. Crisis personnel sought the supporting material and the original paperwork after Plaintiff had been taken into custody.

202. Plaintiff recalls hospital staff describing the paperwork as not fully valid when she was admitted.

203. Miller made a copy of the assembled paperwork for German while awaiting the physician's page.

204. Schuylkill County Crisis did not receive the completed physician page by fax from LVHS until approximately 1:15 a.m. on August 22.

205. Plaintiff's detention proceeded while staff were attempting to obtain the missing paperwork.

206. At approximately 5:11 p.m., Plaintiff was read her Section 302 rights.

207. Plaintiff signed hospital paperwork including a slip-and-fall acknowledgment.

208. The LVHS "Patient's Request/Consent to Transfer" form contains "302" on the patient-signature lines for the rights acknowledgment and transfer consent, with signatures on the corresponding witness lines. Plaintiff did not sign that form or consent to the transfer.

209. Plaintiff had been denied communication for hours, although the 302-rights form indicated immediate calls upon arrival.

210. She did not receive her first phone call until after about 6:30 p.m.

211. Around the same time, Davis contacted DCCI, stating he had been "overwhelmed" and had "forgotten" to send the rest of the information.

212. Davis sent additional material later that evening after the Warrant had issued and Plaintiff was already in custody.

213. LVHS personnel continued Plaintiff's detention while obtaining the missing County-issued paperwork.

214. Plaintiff heard an attending physician tell Corporal Goodman that she was being held because of liability concerns.

**H. Mercado**

215. Plaintiff repeatedly requested evaluation and imaging for her injuries as her bruising became more pronounced and her right rib visibly protruded.

216. Plaintiff recalls hospital staff first photographing her injuries at approximately 7:30 p.m., several hours after arrival.

217. Nursing staff documented her injuries.

218. Plaintiff does not recall a physician physically examining her that evening.

219. Psychiatric emergency services documentation records a case report at approximately 4:55 p.m. and a consultation at approximately 7:27 p.m.

220. Mercado's emergency physician note bears a service time of approximately 7:20 p.m. on August 21 but an electronic signature date of August 23, 2023.

221. Mercado’s Section 302 certification lists arrival at 3:30 p.m., initial examination at 3:54 p.m., and his signature at approximately 7:33 p.m. on August 21, 2023.

222. He recorded suicidal ideation with multiple plans and wrote that Plaintiff admitted making a statement.

223. The certification itself does not specify the plans or the statement or identify an act in furtherance of suicide.

224. Mercado selected inpatient psychiatric treatment.

225. Plaintiff does not recall Mercado physically examining her that evening, although he signed off on the 302.

226. On August 22, a psychiatric emergency services note recorded that Mercado had upheld the Section 302 and that the physician certification page was on the chart while the original packet was still awaited.

227. Van Sickle confirmed that the original remained at DCCI, which sent it overnight to Schuylkill County Crisis.

228. At 10:49 a.m. on August 23, Schuylkill crisis worker Brittany Bendetti recorded that an LVHS nurse said Bendetti could bring the original to the unit.

229. Bendetti then set out to deliver it.

230. The chart contains scans of the same physician certification with different scan dates and orientations of the patient-identification label.

231. The Section 302 application asserted inability to care for oneself.

232. Mercado's certification recorded suicidal ideation with multiple plans without identifying conduct showing an inability to meet personal needs or any act in furtherance of a suicide threat.

233. Plaintiff's intake account contradicted Davis's account, and nursing documentation recorded her denial of suicidal and homicidal thoughts.

234. Plaintiff's requested chest and abdominal x-rays were delayed until August 22, 2023.

235. The medical assessment included a rib contusion.

236. Plaintiff was held overnight in the emergency room, was denied requests for showering and wound cleaning, and was ultimately transferred to LVHS Adult Behavioral Health.

**I. Release and records**

237. On August 23, 2023, Plaintiff met with a treating physician following her transfer from the emergency department.

238. She described the assault and frame-up by Davis and consistently denied suicidal ideation.

239. She reported that a PSP corporal had told her aspects of the incident had been "handled incorrectly."

240. On August 24, 2023, a physician or resident told Plaintiff that she should not be there and that Davis's complaints were trivial.

241. Before LVHS continued involuntary treatment under Section 302, hospital personnel did not offer Plaintiff voluntary examination and treatment under Section 201.

242. On August 24, 2023, the treating physician indicated an intent to change Plaintiff's status to voluntary treatment to facilitate discharge.

243. Plaintiff signed the consent for voluntary inpatient treatment on August 24, 2023.

244. The form lists August 22 in the admission-date field and August 24 on the signature line.

245. The August 24 progress note records the change to voluntary status.

246. A separate August 24 treatment plan records that Plaintiff wanted to leave, disagreed with that plan, and declined to sign it.

247. Plaintiff was discharged on August 25, 2023.

248. Hospital staff reported that injury photographs and records had not been visible in the system and became available by discharge.

249. A discharge nurse further stated that staff had been unable to see Plaintiff's information and injuries until that day and referred to Plaintiff "dating a cop."

250. LVHS recorded Plaintiff's cell phone among her valuables and noted that security had been notified.

251. Plaintiff was released without her phone being returned to her.

252. The hospital chart labels several wound entries and associated image records "[REMOVED]," including entries for Plaintiff's scalp, forearm, knees, lower legs, back, and buttocks.

253. The produced chart includes wound descriptions, final assessment entries dated August 25, and images associated with entries marked "[REMOVED]."

254. Teter's video of part of the Weiser State Forest incident was later disseminated widely by television and internet media, showing portions of the assault and describing Plaintiff's involuntary commitment.

**J. Dauphin County's Section 302 screening and reconsideration procedures**

255. At all relevant times, Andrea Kepler was Administrator of DCMH, the County department through which DCCI operated.

256. Upon information and belief, the County, through DCMH, assigned responsibility for establishing the operating procedures used by DCCI caseworkers and delegates to prepare, evaluate, and reconsider Section 302 applications and warrants.

257. Kepler served as Administrator, and the August 22 airbill identifies her as the County's sender contact for the original Section 302 packet.

258. Under 50 P.S. § 7302(a), the county administrator has authority to issue Section 302 warrants.

259. The administrator also administers the County mental health program under 50 P.S. § 4305(1).

260. The administrator's office assists petitioners with preparation of applications and designates representatives to issue warrants under 55 Pa. Code § 5100.21(c)–(d).

261. Pascoa issued the Warrant here as a DCCI Mental Health Delegate.

262. Upon information and belief, the County, through the mental health administration described above, directed a Section 302 screening procedure under which caseworkers prepared applications and delegates authorized warrants on selected accounts from personally involved applicants without adequately assessing whether the stated facts satisfied the particular statutory ground asserted.

263. The application asserted that Plaintiff could not care for herself, but Davis's account did not identify the impaired self-care and resulting danger described in paragraph 76.

264. County personnel approved the application on Davis's selected account without independently contacting Plaintiff, after Van Sickle departed from DCCI's ordinary practice of attempting that contact based on Davis's report about Lykens's instructions.

265. Upon information and belief, the County's procedure for reconsidering an issued warrant permitted personnel to reaffirm its validity by relying on prior County authorization and the applicant's civilian status without reassessing the substantive sufficiency of the information supporting the warrant when hospital personnel reported concerns about the petition and missing documentation.

266. County personnel prepared, approved, and reaffirmed the Warrant as follows:

a. Van Sickle prepared the application from Davis's account and selected text fragments after he disclosed that he was off duty and Plaintiff's former romantic partner;

b. Pascoa separately reviewed that application and issued the Warrant on the factual account supplied;

c. After hospital staff reported problems with the petition and missing documentation, County personnel reaffirmed the warrant, with Van Sickle explaining that Davis had been off duty and the County had granted it. Crisis staff then indicated that the Section 302 process would proceed.

267. In the alternative, upon information and belief, the County failed to provide adequate instruction and supervisory guidance to its Section 302 caseworkers and delegates concerning assessment of the substantive sufficiency of materially incomplete reports from personally involved applicants and reconsideration of that sufficiency when concerns about an approved petition were reported.

268. The County controls its internal screening instructions, training materials, supervisory requirements, and administrative delegations.

269. Upon information and belief, County officials responsible for the Section 302 program knew that caseworkers and delegates regularly would decide whether to authorize involuntary examinations on third-party reports, including reports from personally involved applicants, and would receive questions about applications already approved.

270. Those decisions directly expose the subject to seizure and detention.

271. Upon information and belief, County officials maintained procedures and instruction that substituted the applicant's civilian status and prior County approval for assessment

of the substantive grounds for an involuntary examination, with deliberate indifference to the resulting risk of unsupported seizure and detention.

272. The challenged County procedures caused Van Sickle's preparation and Pascoa's authorization of the application on the deficient factual basis alleged above, resulting in the warrant used to seize and transport Plaintiff.

273. The County's reaffirmation contributed to continued detention through hospital personnel's reliance on that reaffirmation in proceeding with the Section 302 process, together with the physician's certification and subsequent treatment decisions.

274. These County acts caused Plaintiff's initial seizure and contributed to her continued detention, together with the conduct of Davis, the responding troopers, and the Hospital Defendants.

**K. Continuing harm**

275. Upon information and belief, commitment-related records continue to contain Davis's false suicide-threat, intellectual-disability, or encounter representations.

276. Plaintiff's hospital admission records contain the challenged Section 302 application and physician certification, including the disputed factual content described above.

277. The continued maintenance and dissemination of that false factual content cause ongoing harm to Plaintiff's personal and professional reputation and commitment-related collateral consequences.

278. Plaintiff sought expungement and was advised by personnel at the District Attorney's office that she should wait until this litigation concluded.

279. Schuylkill County Crisis documented preparing the Pennsylvania Instant Check System (PICS) notification and sending it to SAM by secure email after receiving Mercado's certification.

280. Following discharge, Plaintiff received orthopedic care and physical therapy in 2023 and 2024 for left-knee, sacroiliac, back, neck, head, and numbness complaints.

281. Her providers advised her that she had a left-knee bone contusion and patellofemoral symptoms, aggravation of preexisting sacroiliac and back pain, and a possible concussion.

282. Plaintiff underwent an evaluation for traumatic brain injury in January 2024 and was subsequently advised by a treating provider in May 2025 that she had a meniscus tear.

283. Plaintiff incurred expenses for the evaluation and treatment of these injuries.

**L. Color of law and scope of employment**

284. Davis acted, or purported to act, under color of state law by using his actual or apparent authority as a PSP trooper, despite being off duty during substantial portions of the incident.

285. Davis used his status as a PSP trooper to enter a restricted part of the Lykens station and seek help from the supervisor.

286. He identified himself as a trooper to DCCI, emailed DCCI from his PSP account, took the faxed Warrant at the barracks, and invoked the Warrant in enlisting Teter's help.

287. Davis restrained Plaintiff himself, summoned PSP assistance by reporting that she was resisting arrest, later described the encounter to DCCI as an attack on an on-duty officer, and submitted written paperwork claiming self-activation after the incident.

288. In the alternative, to the extent Davis is found to have acted outside the scope of his employment for purposes of the state-law claims, he did so in pursuit of a personal purpose: retaliation against, and control over, Plaintiff after she ended their relationship.

## CAUSES OF ACTION

### COUNT I — 42 U.S.C. § 1983: Unreasonable Seizure (Fourth Amendment)

*Against Ronald Keith Davis individually*

289. Each and every allegation of the fact and the implications therefrom contained in the preceding paragraphs by reference are re-alleged herein as if stated verbatim.

290. A seizure of a person for an involuntary mental health examination is a seizure under the Fourth Amendment, applicable to the States through the Fourteenth Amendment, and must be supported by probable cause.

291. A warrant does not justify a seizure when the person who procured it knowingly, or with reckless disregard for the truth, made false statements or omissions that were material to the decision to issue it.

292. Davis knowingly made false statements to obtain the Warrant.

293. He told PSP and DCCI that Plaintiff had threatened suicide, was intellectually disabled, and was unstable, and he presented fragments of her text messages stripped of their sarcastic context.

294. Davis omitted the full text conversations and the context supporting Plaintiff's explanation that the selected messages were sarcastic replies, including his earlier threat to portray her as mentally ill after a breakup.

295. Davis had also told Van Sickle he understood prior remarks about self-harm as expressions of frustration and anger.

296. He knew the surrounding exchanges because he participated in them.

297. The false statements and omissions were material.

298. With Davis's falsehoods corrected and the omitted context included, the application would have described sarcastic responses during a relationship dispute rather than genuine suicide threats.

299. It would not have established the inability to meet personal needs and predicted serious harm required by the asserted inability-to-care ground. At the forest, Plaintiff had been working on her laptop and made no threatening moves before Davis restrained her.

300. Davis then personally carried out the seizure.

301. Ronald Davis acted maliciously, oppressively, and in reckless disregard of Plaintiff's rights.

302. As a direct and proximate result of Ronald Davis's conduct, Plaintiff suffered violations of her constitutional rights, bodily injury, physical pain and suffering, emotional trauma and distress, loss of enjoyment of life, loss of reputation, invasion of privacy, and financial damage.

**WHEREFORE,** Plaintiff demands judgment against Ronald Davis individually as set out in the Prayer for Relief.

## COUNT II — 42 U.S.C. § 1983: Excessive Force (Fourth Amendment)

*Against Ronald Keith Davis individually*

303. Each and every allegation of the fact and the implications therefrom contained in the preceding paragraphs by reference are re-alleged herein as if stated verbatim.

304. Before Davis seized her, Plaintiff was standing near a picnic table, made no threatening moves, and showed no indication of self-harm or threats to others.

305. Davis grabbed Plaintiff in a wrestling-style hold, lifted her from the ground, carried her several yards, and slammed her against a vehicle.

306. Plaintiff repeatedly told him she could not breathe.

307. Davis forced Plaintiff's hands behind her back and used his body weight to compress her rib cage and torso against the vehicle, restricting her breathing.

308. While restrained and unable to breathe, Plaintiff bit Davis once and kicked him in an effort to free herself from his hold.

309. When Plaintiff asked why she was being seized, Davis escalated the force by slamming her head-first into the ground and landing on top of her.

310. The initial seizure occurred before Teter began recording.

311. During the recorded portion of the encounter, Davis continued restraining Plaintiff while she struggled to breathe.

312. The force was objectively unreasonable under Graham v. Connor, 490 U.S. 386 (1989), in light of Plaintiff's lack of threatening conduct before restraint, the nature of the holds and impacts, her repeated statements that she could not breathe, and the circumstances of her biting and kicking after she was restrained and unable to breathe.

313. Even if some restraint had been justified to carry out an involuntary examination, the compression that restricted Plaintiff's breathing, the impacts, and the force Davis continued to use after she told him she could not breathe exceeded the force reasonably necessary under those circumstances.

314. As a direct and proximate result of Ronald Davis's force, Plaintiff suffered bodily injuries, including injuries to her ribs, elbow, and knee and abrasions and contusions to her head and body, together with physical pain and emotional distress.

315. Ronald Davis's force caused or aggravated Plaintiff's injuries, physical pain, and emotional distress.

**WHEREFORE**, Plaintiff demands judgment as set out in the Prayer for Relief.

**COUNT III — 42 U.S.C. § 1983: Abuse of Process (Fourth Amendment)**

*Against Ronald Davis individually*

316. Each and every allegation of the fact and the implications therefrom contained in the preceding paragraphs by reference are re-alleged herein as if stated verbatim.

317. In the alternative, assuming that the Warrant was valid when issued, Davis misused the pending Section 302 process after Plaintiff's seizure to sustain involuntary confinement for personal retaliation and control.

318. After Plaintiff had been seized and taken to the Hospital, and while hospital staff were questioning the commitment paperwork and seeking missing documents, DCCI spoke with Davis.

319. Davis then portrayed Plaintiff as having attacked an on-duty officer, while omitting his own initial assault.

320. This account falsely presented Davis as acting on duty during the encounter and concealed the sequence in which his restraint and interference with Plaintiff's breathing preceded her biting and kicking.

321. Davis supplied the materially misleading account of an attack on an on-duty officer to DCCI while hospital personnel were questioning the commitment paperwork.

322. Davis used the pending process to continue Plaintiff's confinement in furtherance of his threatened retaliation for ending their relationship.

323. Davis later contacted DCCI, stated that he had been overwhelmed and had forgotten to send the remaining information, and transmitted additional materials while Plaintiff remained detained.

324. Following the communications described above, crisis staff indicated that the Section 302 process would proceed.

325. Davis's materially misleading post-issuance account contributed to continuation of the Section 302 process and Plaintiff's involuntary confinement, depriving her of liberty through an unreasonable continued seizure under the Fourth Amendment and causing resulting emotional distress and other attributable harm.

**WHEREFORE**, Plaintiff demands judgment as set out in the Prayer for Relief.

**COUNT IV — 42 U.S.C. § 1983: Deprivation of Liberty Based on Fabricated Evidence (Fourteenth Amendment), pleaded in the alternative to Count I**

*Against Ronald Davis individually*

326. Each and every allegation of the fact and the implications therefrom contained in the preceding paragraphs by reference are re-alleged herein as if stated verbatim.

327. Davis deliberately supplied materially false factual representations and knowingly distorted the text-message evidence to procure and sustain Plaintiff's involuntary commitment.

328. Davis represented to PSP and DCCI that Plaintiff had threatened suicide and was intellectually disabled.

329. Davis selected the fragments identified above from exchanges about his deception, anger, and efforts to isolate Plaintiff.

330. He presented selected text fragments as genuine evidence of danger while withholding the surrounding exchanges that conveyed their sarcastic meaning.

331. Davis knew that context because he participated in those exchanges and deliberately presented the fragments as genuine evidence of danger.

332. After seizure, he gave DCCI the further account that Plaintiff had attacked an on-duty officer, omitting his own initial assault and the sequence in which his restraint and interference with her breathing preceded her biting and kicking.

333. Davis's account that Plaintiff attacked an on-duty officer omitted that he initially described his role to Klein as that of a boyfriend and claimed self-activation in writing only after the incident.

334. Davis's pre-warrant false representations about Plaintiff and the selected text fragments described above supplied the basis for Van Sickle's preparation of the Section 302 Application and Pascoa's issuance of the Warrant, which Davis used to seize Plaintiff and initiate her transport and confinement.

335. Davis supplied the later account of an attack on an on-duty officer after the Warrant issued, while Plaintiff remained confined.

336. There was a reasonable likelihood that, without Davis's deliberate falsehoods and distortions, the application would not have supported the asserted statutory ground, the Warrant would not have issued, and Plaintiff's involuntary seizure and confinement would not have occurred.

337. As to continued confinement, DCCI received Davis's later account during the hospital communications described above, after which crisis staff indicated that the Section 302 process would proceed.

338. DCCI's receipt and use of Davis's later materially misleading account helped sustain the pending commitment process and Plaintiff's detention.

339. Davis knew his representations were false. He participated in the text exchanges and physical encounter, knew he was off duty when the encounter began, and had threatened to portray Plaintiff as mentally ill despite knowing she was not.

340. The resulting involuntary confinement deprived Plaintiff of liberty through the use of deliberately fabricated evidence, in violation of the Fourteenth Amendment, pleaded in the alternative to the Fourth Amendment theory in Count I.

**WHEREFORE**, Plaintiff demands judgment as set out in the Prayer for Relief.

**COUNT V — 42 U.S.C. § 1983: Municipal Liability (Monell)**

*Against County of Dauphin*

341. Each and every allegation of the fact and the implications therefrom contained in the preceding paragraphs by reference are re-alleged herein as if stated verbatim.

342. Upon information and belief, the County's screening and reconsideration procedures described in paragraphs 255 through 274 caused Plaintiff's unsupported initial seizure and contributed to her continued detention in violation of the Fourth Amendment.

343. The challenged screening procedure permitted authorization on a materially incomplete account from a disclosed former romantic partner without adequate assessment of whether the stated facts supported the asserted statutory ground.

344. The challenged reconsideration procedure permitted reaffirmation based on prior County approval and the applicant's civilian status without reassessing the substantive basis for the Warrant when hospital and crisis personnel reported concerns, as described in paragraphs 180 through 194.

345. Upon information and belief, the County assigned its mental health administration, under Kepler, responsibility for establishing and directing the screening and reconsideration procedures and the instructions used by DCCI caseworkers and delegates.

346. Upon information and belief, the County established and directed those institutional screening and reconsideration procedures.

347. The challenged screening procedure caused Van Sickle and Pascoa to prepare and approve the application on the materially deficient account described in paragraphs 67 through 92.

348. The resulting Warrant supplied the asserted authority used to seize and transport Plaintiff.

349. In the alternative, the County failed to provide adequate instruction and supervisory guidance for assessing whether selected reports from personally involved applicants supported the asserted statutory ground and for reconsidering that sufficiency after reported concerns, as described in paragraphs 267 through 271.

350. Upon information and belief, County officials responsible for these procedures knew that caseworkers and delegates regularly made liberty-restricting decisions on third-party reports and received concerns about approved applications, yet maintained the deficient instruction and procedures with deliberate indifference to unsupported seizures and detentions.

351. Van Sickle prepared the application, Pascoa separately approved it, and County personnel reaffirmed the Warrant in the sequence set out in paragraph 266(a)–(c).

352. Upon information and belief, the participating personnel implemented the County's screening and reconsideration procedures.

353. The County controls the internal instructions, training materials, supervisory requirements, and administrative delegations identified in paragraph 268.

354. When hospital personnel reported petition and documentation concerns, Van Sickle reaffirmed the Warrant because Davis had been off duty and the County had granted it.

355. Hospital personnel relied on that reaffirmation in proceeding with the Section 302 process, contributing to continued detention together with Mercado's certification and later medical decisions.

356. Plaintiff seeks recovery for the initial seizure and continued detention caused by these County procedures and alleged training or supervisory deficiencies.

**WHEREFORE**, Plaintiff demands compensatory damages, fees, and costs against the County as set out in the Prayer for Relief. No punitive damages are sought against the County.

## COUNT VI — 42 U.S.C. § 1983 and 28 U.S.C. § 2201: Prospective Declaratory and Injunctive Relief

*Against PSP, County of Dauphin, Ronald Keith Davis in his official capacity, and John Doe PSP Troopers 1–15 in their official capacities*

357. Each and every allegation of the fact and the implications therefrom contained in the preceding paragraphs by reference are re-alleged herein as if stated verbatim.

358. Plaintiff seeks prospective relief concerning the allegedly false factual representations that she threatened suicide, was intellectually disabled, and attacked an on-duty officer without the preceding restraint and assault described above.

359. Upon information and belief, the Section 302 application and associated commitment and police records continue to contain false factual representations supplied by Davis to PSP and DCCI.

360. Plaintiff seeks correction of the false factual content and its continuing official use as a basis for commitment-related consequences.

361. The official-capacity claims seek prospective correction of the identified records within each officer's current duties and authority.

362. Continued official maintenance, use, and dissemination of these materially false representations perpetuate commitment-related consequences of Plaintiff's deprivation of liberty.

363. Plaintiff seeks an order correcting their continued official use as a factual basis for that commitment and its consequences, under the Fourth and Fourteenth Amendment rights asserted in this pleading.

364. As to PSP and Davis and the existing Doe Troopers in their official capacities, Plaintiff requests correction or annotation of the identified false factual representations in commitment-related records and police notations they maintain or control, expungement where legally available, and notice of an ordered correction to recipients of their transmissions.

365. Relief against each officer is limited to corrective acts within that officer's current official duties and authority.

366. As to Dauphin County, Plaintiff requests correction or annotation of the identified false representations in the Section 302 application and related County records it maintains or controls, expungement where legally available, and notice of an ordered correction to recipients of its transmissions.

367. At all times relevant hereto, PSP employed, controlled, directed, regulated, supervised, advised, promoted, and influenced the conduct and activity of Defendants John Doe Troopers and Ronald Davis who were acting in the course and scope of their respective representation, agency, or employment with and for PSP for their mutual and respective pecuniary benefits during their treatment of Plaintiff and the occurrence of the related complained of errors and omissions, all with the result that PSP are also jointly and severally liable for the acts and

omissions of Defendants John Doe Troopers and Ronald Davis under the doctrines of respondeat superior and/or vicarious liability.

368. To the extent the acts or omissions complained of herein were the result of an act or omission by someone other than Defendants John Doe Troopers and Ronald Davis, those acts or omissions were the result of PSP, by and through PSP's employees, agents and representatives acting within the scope of their respective employment, agency, representation and/or privileges on behalf of PSP in rendering care to Perfanov.

369. The requested correction concerns continuing official use of those records and seeks relief directed to each defendant's present control over the records or their dissemination.

370. The requested relief reaches hospital-created material only insofar as the challenged information is included in records within these Defendants' respective possession or control.

**WHEREFORE,** Plaintiff requests prospective declaratory and injunctive relief addressing an ongoing federal violation, as set out in the Prayer for Relief, against each Defendant only within its or the officer's present responsibility and authority. No damages or declaration of past liability alone are requested against PSP or any officer in an official capacity.

## COUNT VII — Assault and Battery

*Against Ronald Davis individually*

371. Each and every allegation of the fact and the implications therefrom contained in the preceding paragraphs by reference are re-alleged herein as if stated verbatim.

372. Davis rushed toward Plaintiff while she was standing near a picnic table and despite her telling him to stay away.

373. Plaintiff apprehended imminent harmful contact as he approached.

374. Davis grabbed Plaintiff in a wrestling-style hold, lifted and carried her, slammed her against a vehicle, forced her hands behind her back, and pressed his weight into her rib cage and torso while she repeatedly said she could not breathe.

375. After she bit and kicked in an effort to escape that restraint, Davis slammed her head-first into the ground and landed on top of her.

376. Teter began recording after the initial seizure.

377. Davis intentionally placed Plaintiff in apprehension of imminent harmful contact and intentionally made harmful and offensive contact with her.

378. The force described above exceeded any force reasonably necessary to execute an involuntary-examination warrant.

379. Plaintiff did not consent to Davis's contact.

380. In the alternative, for purposes of this state-law claim, Davis acted outside the scope of his employment in pursuing personal retaliation and control after the end of their relationship, as alleged above.

381. His invocation of police authority is alleged separately as conduct under color of state law for the federal claims.

382. As a direct and proximate result of Ronald Davis's assault and battery, Plaintiff suffered the bodily injuries caused or aggravated by his force, physical pain and suffering, emotional trauma and distress, loss of enjoyment of life, and financial damage.

383. Davis's harmful and offensive contact caused or aggravated Plaintiff's bodily injuries, pain, and emotional distress.

**WHEREFORE**, Plaintiff demands judgment as set out in the Prayer for Relief.

**COUNT VIII — False Imprisonment**

*Against Lehigh Valley Health Network, Inc., Lehigh Valley Hospital – Schuylkill, and Mercado*

384. Each and every allegation of the fact and the implications therefrom contained in the preceding paragraphs by reference are re-alleged herein as if stated verbatim.

385. Plaintiff was intentionally confined at LVHS from about 3:32 p.m. on August 21, 2023 until her status changed to voluntary on August 24, 2023.

386. LVHS personnel maintained her custody in the emergency department and later Adult Behavioral Health unit.

387. Mercado authorized continued involuntary detention through his physician certification and upheld the Section 302, as reflected in the August 22 note described in paragraph 226.

388. Mercado was employed by LVHN and undertook the assessment, certification, and continuation decisions alleged here within the scope of that employment.

389. Upon information and belief, the other personnel responsible for authorizing or maintaining the challenged confinement acted as LVHN's agents within the scope of their agency in LVHN's operation of LVHS.

390. Upon information and belief, LVHN operated LVHS as described in paragraphs 24 through 26, and the other personnel performed the confinement-related functions within the scope of their agency for LVHN.

391. Plaintiff was aware of the confinement and did not consent to it.

392. The transfer form described in paragraph 208 bears no patient signature.

393. Her signature on the voluntary inpatient consent is dated August 24, as described in paragraphs 243 through 244.

394. Plaintiff's continued involuntary confinement lacked lawful justification because the facts did not satisfy the statutory criteria for involuntary emergency treatment.

395. A County warrant authorizes an emergency examination. Under 50 P.S. § 7302(b), continued involuntary treatment requires a physician's determination that the person is severely mentally disabled within Section 301(b) and in need of immediate treatment.

396. Schuylkill County Crisis initially recorded that LVHS described a Box B petition.

397. The County issued one Box A warrant.

398. The packet initially before the emergency department was a partial copy, and the accompanying page containing a text message was unreadable to Powlick.

399. LVHS personnel continued the hold while crisis staff obtained the supporting materials.

400. German knew that the paperwork had been questioned, reported the additional allegations to Mercado, and documented that the original remained necessary for placement or transfer.

401. Mercado certified continued treatment before the County sent the original.

402. The incomplete packet and conflicting accounts were known during the hold.

403. LVHS personnel relied on the County's reaffirmation of the warrant, and Mercado recorded disputed findings to certify continued treatment, although the reports did not identify conduct satisfying the inability-to-care ground or an act by Plaintiff in furtherance of suicide.

404. The application did not establish conduct showing an inability, without care, supervision, and continued assistance, to meet Plaintiff's needs for nourishment, personal or medical care, shelter, or self-protection and safety, together with a reasonable probability of death,

serious bodily injury, or serious physical debilitation within thirty days without adequate treatment under 50 P.S. § 7301(b)(2)(i).

405. At intake, Plaintiff reported that Davis had assaulted and framed her after she ended their relationship; the 3:47 p.m. nursing entry records her denial of suicidal and homicidal thoughts.

406. LVHS maintained inaccurate and/or falsified records bearing on the justification for her confinement.

407. Mercado's certification recorded suicidal ideation with multiple plans and stated that Plaintiff admitted making a statement.

408. Plaintiff denied suicidal and homicidal thoughts and denied that she had a plan to harm herself.

409. The contemporaneous nursing entry records her denial, and Mercado's own emergency department history records her denial of current or past suicidal ideation, as described in paragraphs 176 and 177.

410. The commitment records contain the specific discrepancies described in paragraphs 180 through 181, 208, 230, and 243 through 244, including the initial Box B description, the entry of "302" in lieu of Plaintiff's signature, differences between certification scans, and different admission and signature dates on the voluntary form. The commitment notification also contains a weight discrepancy.

411. The chart also contains the wound-entry and image labels described in paragraphs 252 and 253.

412. The physician certification lists a 3:54 p.m. examination, within two hours of the recorded arrival, and a 7:33 p.m. signature.

413. The ED event log lists Mercado's assignment and first provider evaluation at approximately 3:54 p.m.

414. Plaintiff does not recall Mercado physically examining her that evening.

415. Under 50 P.S. § 7302(b) and (d), Plaintiff was entitled to discharge if the physician did not find the required condition or if the need for immediate treatment ended.

416. The 120-hour maximum did not authorize continued involuntary treatment after that need ceased.

417. Mercado certified continued involuntary treatment at approximately 7:33 p.m. on August 21, after the 6:04 p.m. update to him recorded in paragraph 193.

418. The August 22 note described in paragraph 226 states that Mercado upheld the Section 302.

419. The continued involuntary treatment authorized or upheld by those decisions lacked the substantive basis required by the asserted commitment ground.

420. The information on which LVHS and Mercado relied did not establish that Plaintiff was severely mentally disabled and in need of immediate treatment.

421. Neither the later production of the original packet nor the voluntary consent signed August 24 supplied that basis for the prior confinement.

422. Mercado's certification and decision upholding the Section 302 authorized or sustained Plaintiff's continued confinement.

423. LVHS personnel maintained Plaintiff's custody and confinement in the emergency department and behavioral health unit.

424. On August 23, Plaintiff described the assault and frame-up to a treating physician and denied suicidal ideation.

425. On August 24, Plaintiff recalls a physician or resident telling her that she should not be there and that Davis's complaints were trivial.

426. The treating physician indicated an intent to change her status to voluntary, and Plaintiff signed the voluntary-treatment consent that day, as described in paragraphs 242 through 245.

427. Each continuation of involuntary treatment required a sufficient statutory ground based on the information available to the responsible decisionmaker at that time.

428. LVHN is vicariously liable for Mercado's commitment-related acts undertaken within the scope of his employment, as described in paragraphs 26 and 388.

429. LVHN is vicariously liable for the confinement-related acts of other personnel undertaken within the scope of the agency relationship described in paragraphs 389 and 390.

430. Mercado's authorization and upholding of continued involuntary treatment without a substantive basis satisfying the asserted commitment ground, and the responsible LVHS personnel's continuation of confinement without that basis, constituted gross negligence under 50 P.S. § 7114(a).

431. Each responsible decisionmaker's assessment and continuation decisions, in light of the information that decisionmaker received, constituted a flagrant departure from the applicable standard of care.

432. As a direct and proximate result, Plaintiff suffered loss of liberty, emotional distress, and other harm attributable to the allegedly unlawful confinement until her status changed to voluntary on August 24, 2023.

433. The confinement caused or aggravated Plaintiff's loss of liberty, emotional distress, and other resulting harm.

**WHEREFORE**, Plaintiff demands judgment as set out in the Prayer for Relief.

**COUNT IX — 42 U.S.C. § 1983: Seizure on a Warrant Lacking Probable Cause (Fourth Amendment)**

*Against County of Dauphin, through the municipal-liability theories pleaded in Count V*

434. Each and every allegation of the fact and the implications therefrom contained in the preceding paragraphs by reference are re-alleged herein as if stated verbatim.

435. Plaintiff incorporates the County screening, authorization, and reconsideration allegations in paragraphs 255 through 274 and Count V.

436. The Section 302 Warrant authorized a seizure for involuntary examination and required an adequate factual basis to believe Plaintiff met the applicable emergency-commitment criteria.

437. The application asserted inability to care for herself under 50 P.S. § 7301(b)(2)(i).

438. The circumstances and selected text fragments reported by Davis, described in paragraphs 67 through 92, did not identify conduct establishing that, because of mental illness, Plaintiff could not meet her needs for nourishment, personal or medical care, shelter, or self-protection and safety, together with a reasonable probability of death, serious bodily injury, or serious physical debilitation within thirty days without adequate treatment.

439. Van Sickle prepared the application from the account of an applicant who disclosed that he was off duty and Plaintiff's former romantic partner; Pascoa separately approved the application and issued the Warrant.

440. The account supplied did not establish the substantive ground asserted for Plaintiff's involuntary examination.

441. Upon information and belief, the County-directed screening procedure described in Count V permitted preparation and approval without adequate assessment of whether the reported

conduct supported the particular statutory ground asserted. In the alternative, the County's training and supervisory deficiencies caused that failure.

442. Those procedures and deficiencies were the moving force behind issuance of the unsupported Warrant, which Davis obtained and used to seize Plaintiff and which the responding troopers used to continue her custody and transport for involuntary examination.

443. When hospital staff reported petition and documentation concerns, County personnel reaffirmed the Warrant by reference to Davis's off-duty status and the County's prior approval.

444. The County's reconsideration procedure contributed to continued detention without resolving the substantive deficiency in the asserted basis for the seizure.

445. The County's own screening and reconsideration procedures and deliberately indifferent institutional omissions identified in Count V caused Plaintiff's unsupported seizure and continued detention.

446. As a direct and proximate result, Plaintiff suffered the seizure, loss of liberty, physical pain, emotional distress, and other harm caused or aggravated by the County's issuance and reaffirmation of the Warrant.

**WHEREFORE,** Plaintiff demands judgment against County of Dauphin as set out in the Prayer for Relief. No punitive damages are sought against the County.

## COUNT X — 42 U.S.C. § 1983: Hospital Detention Without Due Process (Fourteenth Amendment; Fourth Amendment in the alternative)

*Against LVHN, LVHS, and Mercado*

447. Each and every allegation of the fact and the implications therefrom contained in the preceding paragraphs by reference are re-alleged herein as if stated verbatim.

448. LVHN, LVHS, and Mercado, through their respective acts and institutional procedures described below, caused or prolonged Plaintiff's involuntary confinement from admission on August 21, 2023 until her status changed to voluntary on August 24, 2023, without the substantive grounds and individualized determination required for continued involuntary treatment.

449. PSP troopers delivered Plaintiff to LVHS as a Section 302 patient and remained with her.

450. LVHS initially described a Box B petition to Schuylkill County Crisis.

451. As described in paragraphs 180 through 192, hospital and crisis staff identified defects and missing pages, Powlick contacted DCCI, Van Sickle forwarded supporting materials and reaffirmed the Box A warrant, and crisis staff left the decision whether Plaintiff would stay to LVHS.

452. At approximately 5:10 p.m., psychiatric emergency services documentation recorded that the petitioning statement had been completed incorrectly.

453. Plaintiff also heard an attending physician tell Corporal Goodman that she was being held because of liability concerns.

454. Upon information and belief, responsible hospital personnel and state participants jointly maintained Plaintiff's confinement after the County reaffirmed the Warrant and while the original paperwork remained at DCCI.

455. Upon information and belief, the communications among Powlick, Van Sickle, and LVHS personnel concerning the paperwork, the reaffirmation of the warrant, and the decision to keep Plaintiff in custody were part of their joint continuation of the hold despite the insufficient substantive basis for involuntary treatment.

456. Mercado signed the physician certification for continued involuntary treatment at approximately 7:33 p.m. on August 21. The August 22 note states that Mercado upheld the Section 302.

457. German forwarded the additional reports and case updates to Mercado at approximately 6:04 p.m. on August 21 and recorded that the original packet was still needed for placement or transfer.

458. DCCI sent the original to Schuylkill County Crisis by overnight FedEx on August 22, as described in paragraphs 227 and 257.

459. Upon information and belief, LVHS and LVHN maintained an institutional detention procedure that permitted continued confinement based on the County's reaffirmation while staff sought missing paperwork, despite an insufficient substantive basis for continued involuntary treatment.

460. Hospital personnel continued custody while crisis personnel sought additional materials. Mercado certified continued treatment before DCCI sent the original paperwork. Plaintiff recalls that hospital personnel told her similar incidents involving purportedly invalid Section 302 commitments had happened before, as described in paragraph 184.

461. Upon information and belief, LVHS implemented that procedure, and LVHN directed or maintained it through its operation of LVHS. The procedure caused or prolonged Plaintiff's confinement.

462. Plaintiff had a protected liberty interest in freedom from involuntary psychiatric confinement without a constitutionally sufficient basis.

463. The hospital and state participants continued confinement after the County reaffirmed the Warrant and while the original paperwork remained at DCCI, without a sufficient

individualized determination that Plaintiff was severely mentally disabled and required immediate involuntary treatment.

464. Plaintiff disputed Davis's account at intake.

465. The 3:47 p.m. nursing entry and Mercado's emergency department history both record her denial of suicidal ideation.

466. Mercado's emergency department examination and Section 302 certification record contrary findings of suicidal ideation.

467. The certification itself does not identify the particular plans or the statement it attributes to Plaintiff.

468. The reports supporting continued detention did not describe conduct showing the impaired self-care and probable harm asserted in the application or conduct in furtherance of a suicide threat.

469. The physician certification records an examination at 3:54 p.m. and certification at approximately 7:33 p.m.

470. The responsible participants continued Plaintiff's involuntary confinement without constitutionally adequate individualized assessment and reassessment of the asserted substantive ground.

471. In the alternative, to the extent the Fourth Amendment governs the challenged period of continued custody, the jointly maintained confinement constituted a continued seizure without probable cause.

472. In the alternative, to the extent substantive due process governs, the responsible participants knowingly or with deliberate indifference relied on the available commitment paperwork and County reaffirmation in place of a sufficient treatment determination despite an

opportunity to assess and reconsider the grounds for confinement. Their conduct was arbitrary and conscience-shocking.

473. As a direct and proximate result, Plaintiff suffered loss of liberty, emotional distress, physical pain or aggravation caused by confinement, and other attributable harm during the challenged involuntary period.

**WHEREFORE,** Plaintiff demands judgment against LVHN, LVHS, and Mercado as set out in the Prayer for Relief.

## COUNT XI — 42 U.S.C. § 1983: State-Created Danger (Fourteenth Amendment), pleaded in the alternative

*Against County of Dauphin, through the municipal-liability theories pleaded in Count V*

474. Each and every allegation of the fact and the implications therefrom contained in the preceding paragraphs by reference are re-alleged herein as if stated verbatim.

475. In the alternative, if Davis's initial seizure and assault were private conduct, the County's issuance and transmission of the Warrant created or increased Plaintiff's exposure to that private danger.

476. County personnel were informed that the applicant was an off-duty trooper and Plaintiff's former romantic partner.

477. County staff issued and faxed the Warrant to Lykens after Davis disclosed that he was off duty and was Plaintiff's former romantic partner.

478. During the County's contacts with him after approval and transmission, Davis stated that he would begin looking for Plaintiff himself.

479. Issuance and transmission of the Warrant supplied a coercive state authorization that Davis obtained and used to seize Plaintiff.

480. Those affirmative acts made Plaintiff more vulnerable to the personally involved applicant's use of force than she would have been without the Warrant.

481. Plaintiff was the person named in the application and the applicant's known former partner.

482. The alleged procedure exposed that identified person to coercive seizure on the applicant's materially deficient account.

483. Physical restraint and resulting injury were foreseeable and fairly direct consequences of issuing an executable warrant on that account and making it available at the personally involved trooper-applicant's barracks.

484. Davis obtained the Warrant, located Plaintiff, and used it in the seizure and assault described above.

485. The County's screening and authorization procedure allowed time to assess the asserted ground and the disclosed personal involvement before coercive process issued.

486. Upon information and belief, County officials acted with deliberate indifference to the obvious risk that such process could empower the personally involved applicant to subject Plaintiff to unsupported restraint and injury. That affirmative use of authority shocks the conscience.

487. The County's screening procedure and alternative training and supervisory deficiencies described in paragraphs 255 through 274 and Count V caused issuance and transmission of the Warrant and increased Plaintiff's exposure to Davis's private use of force.

488. As a direct and proximate result of the County's affirmative enhancement of the danger, Plaintiff suffered bodily injury, pain, emotional distress, and other harm caused or

aggravated by Davis's ensuing private seizure and assault, to the extent attributable to the County's acts.

**WHEREFORE,** Plaintiff demands judgment against County of Dauphin as set out in the Prayer for Relief. No punitive damages are sought against the County.

**COUNT XII — 42 U.S.C. § 1983: Conspiracy to Violate Civil Rights**

*Against Ronald Keith Davis individually, County of Dauphin, LVHN, LVHS, and Mercado*

489. Each and every allegation of the fact and the implications therefrom contained in the preceding paragraphs by reference are re-alleged herein as if stated verbatim.

490. Upon information and belief, Davis, through his communications with DCCI, and the County and hospital personnel identified below acted pursuant to a common understanding to continue Plaintiff's involuntary detention at LVHS on August 21, 2023, despite the insufficient factual basis for that detention.

491. After the forest seizure, Powlick contacted DCCI about the missing and unreadable paperwork.

492. Van Sickle reaffirmed the warrant and forwarded additional materials to Powlick.

493. Davis supplied his account of a purported attack on an on-duty officer to DCCI while those communications were ongoing.

494. Powlick left the decision whether Plaintiff would stay to the emergency department.

495. German forwarded the additional reports to Mercado at approximately 6:04 p.m. and updated the emergency department nurse.

496. Plaintiff heard an attending physician tell Goodman that she was being held because of liability concerns.

497. Mercado subsequently signed the certification and LVHS personnel continued the hold.

498. In furtherance of the understanding, Davis supplied his materially misleading post-seizure account and transmitted additional materials while the commitment remained pending.

499. Davis knowingly sought continuation of confinement on a misleading basis. He participated in the encounter, knew his duty status, and had previously threatened to portray Plaintiff as mentally ill despite knowing she was not.

500. Upon information and belief, County personnel furthered the understanding by reaffirming the Warrant after the hospital and crisis staff identified the defects described above and by supplying additional material while the hold continued.

501. The County's institutional screening and reconsideration procedures and alternative deliberately indifferent omissions described in Count V caused the County participation and resulting continued confinement.

502. The August 22 note records that Mercado upheld the Section 302.

503. DCCI sent the original paperwork to Schuylkill County Crisis after Mercado signed the physician certification, as described in paragraphs 221, 227, and 257.

504. Upon information and belief, LVHS and LVHN maintained and implemented the institutional procedure described in Count X, causing their participation in the joint continuation of confinement.

505. Upon information and belief, Mercado participated in the understanding by certifying continued involuntary treatment and upholding the Section 302 after German's documented update.

506. The alleged agreement and acts prolonged the involuntary detention at LVHS described in Count X.

507. As a direct and proximate result, Plaintiff suffered loss of liberty, emotional distress, and other injury caused or aggravated by the continued involuntary confinement through August 24, 2023.

508. Plaintiff seeks a single recovery for overlapping injury under the alternative federal and state-law theories.

**WHEREFORE,** Plaintiff demands judgment against the Defendants named in this count as set out in the Prayer for Relief. No punitive damages are sought against the County.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment in her favor and award:

(a) Compensatory damages against the Defendants against whom individual or institutional damages claims are pleaded, in an amount to be determined at trial; no monetary relief is sought against PSP, Davis in his official capacity, the Doe Troopers in their official capacities, or any party dismissed with prejudice;

(b) Punitive damages, where permitted, against Ronald Keith Davis individually, LVHN, LVHS, and Mercado; no punitive damages are sought against the County, PSP, or any officer in an official capacity;

(c) Nominal damages on the federal claims against Ronald Keith Davis individually, the County, LVHN, LVHS, and Mercado, where available; no nominal damages are sought against PSP or any officer in an official capacity;

(d) Prospective declaratory relief under Count VI concerning continued official use of the identified false factual representations in commitment-related records, limited to an ongoing

federal violation and conduct within each Defendant's present responsibility; no declaration of completed past liability alone is sought against PSP or an officer in an official capacity;

(e) Prospective injunctive relief under Count VI directing PSP, the County, and Davis and the existing Doe Troopers in their official capacities, within each Defendant's current duties and legal authority, to correct or annotate the identified false factual representations in records each maintains or controls, expunge them where legally available, and notify recipients of an ordered correction to the extent authorized by law;

(f) Reasonable attorneys' fees and costs under 42 U.S.C. § 1988 on the federal claims for which such relief is available;

(g) Pre- and post-judgment interest; and

(h) Such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable under Federal Rule of Civil Procedure 38.

Respectfully submitted,

HAGGERTY SILVERMAN & JUSTICE, P.C.

Dated: 11/23/2026

By: ______________________________

Randall M. Justice, Esquire
PA Attorney ID No. 200414
240 North Duke Street
Lancaster, PA 17602
(717) 397-3200
Randall@haggertylaw.com
Attorney for Plaintiff Michelle Perfanov